UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond Walter MONASTERSKI,
Defendant-Appellant.

No. 77–5166.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1977.

Decided Dec. 13, 1977.

Carl Ziemba, Detroit, Mich., for defendant-appellant.

Philip M. Van Dam, U. S. Atty., Gordon S. Gold, Detroit, Mich., for plaintiff-appellee.

Before CELEBREZZE and PECK, Circuit Judges, and WALINSKI,* District Judge.

CELEBREZZE, Circuit Judge.

Appellant, Raymond Walter Monasterski, was found guilty by a jury of possessing goods stolen from an interstate shipment, knowing them to have been stolen, in violation of 18 U.S.C. § 659. Appellant raises four substantial issues in this appeal, including whether the goods in question had lost their status as stolen goods, thus barring Appellant's conviction for possession of stolen goods. We reverse Appellant's conviction on the basis of our disposition of this issue, making it unnecessary to reach the other issues.

In the early morning hours of June 17, 1976, Rodney Szpytek (age 15), David Fusto (age 16) and Greg Ploshehanski (age 18) met with James "Cold Boy" Logan (age 35) in a Detroit restaurant. There it was planned that the three youths would steal some tires from a Conrail boxcar in a nearby railroad yard. Logan left these boys to their own devices and within hours they had managed to carry thirty Firestone tires out of the boxcar and under a fence surrounding the railroad yard. Before they could get much farther their scheme was foiled when they were apprehended by Conrail police. The Conrail police then called the FBI, whose agents arrived on the scene shortly thereafter. Desirous of catching the intended outlet or "fence" for the stolen tires, the Conrail police and FBI agents talked the three young thieves into following through on their intended disposition of the tires. The youths cooperated fully in this scheme which was modeled after events they said would have occurred but for their arrests.

The Conrail police placed identifying marks on all the purloined tires and loaded twenty of them into a van they had supplied. The other ten tires were loaded into Ploshehanski's car. A Conrail police officer then drove the loaded van to a Detroit park, accompanied by the others in Ploshehanski's vehicle. The three youths left the park at the police's direction and delivered the carload of ten tires to the nearby home of Logan and placed them in his basement. Logan had helped plan the theft so he knew what was transpiring except for being totally unaware that the thieves had been caught and were then acting under police orders and were even under police surveillance. The youths returned to the van in the park, picked up another load of ten tires and delivered them to Logan's home. Upon arriving at Logan's home, they found Logan about to leave in his own car. Szpytek joined Logan, who had loaded seven of the initial delivery of tires into his car while the second load was en route. Logan and Szpytek drove to the home of Appellant, whom they knew as "Cadillac Ray." Fusto and Ploshehanski followed with the second load of ten tires in Ploshehanski's car.

Logan testified at trial that Appellant had been his outlet for stolen tires before [1]

---

* The Honorable Nicholas J. Walinski, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

1. Szpytek also testified that he had delivered stolen tires to Appellant on a prior occasion.

and that he had called Appellant on the morning of this theft to arrange delivery of this batch. Logan said that Appellant told him, at least initially, that he did not want this load of tires and that he was getting out of the "business." Nevertheless, Logan got the impression by the end of the conversation that Appellant would try to dispose of the tires and the initial delivery of seventeen tires was made to Appellant's home.

Fusto and Ploshehanski testified in substance that upon arrival with the first seventeen tires Appellant told Logan that he (Appellant) would "take care" of the tires and that Appellant told Logan not to worry about the money if Appellant was not home when the second load was delivered. Appellant testified that upon arrival of the first batch he told Logan and Szpytek that he did not want the tires and that they were left at his home over his objection. This testimony was corroborated by Appellant's daughter-in-law who lived with him. The final delivery of the remaining thirteen tires was made later the same morning, June 17, when Appellant was not home. All the tires were placed in a shed adjacent to Appellant's home. Both deliveries were made under the watchful eye of the Conrail police and FBI agents.

On the afternoon of June 17, FBI agents obtained and executed a search warrant, seizing the tires from Appellant's shed and arresting him. Appellant's indictment and trial followed in due course. Logan was arrested the same day and later pled guilty to possession of stolen goods. The record does not indicate that any criminal or juvenile court charges were ever brought against Szpytek, Fusto, or Ploshehanski.[2]

■ Appellant argues that these largely uncontested facts compel reversal of his conviction. His reasoning is that the tires in question had lost their status as stolen goods when they were recovered by the Conrail police, thus precluding conviction for possession of stolen goods. We agree.

Appellant was convicted of violating the following portion of 18 U.S.C. § 659:

> Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen . . .
>
> Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The phrase "such goods or chattels" refers to the preceding paragraph of § 659, which condemns in pertinent part:

> Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any . . . railroad car, . . . with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate . . . shipment of freight, express, or other property . . . . .

Under the plain terms of the relevant portion of this statute, one can be convicted only if the Government proves beyond a reasonable doubt that, *inter alia*, the defendant bought, received or possessed *stolen* goods or chattels.

The rule that one cannot be convicted of receiving stolen goods if, before the stolen goods reached the would-be receiver, the goods had been recovered by their owner or his agent had its genesis in two nineteenth century English cases. *Regina v. Schmidt*, L.R. 1 Cr.Cas.Res. 15 (1866); *Regina v. Dolan*, 29 Eng.Law & Eq. 533 (1855).

The rule in *Schmidt* and *Dolan* has been almost universally adopted by the state courts in this country presented with the

---

The District Court admitted this testimony to show what Appellant's "knowledge and intent was at the time that he committed the act in question." *See* Federal Rule of Evidence 404(b). Admission of this testimony is the basis of the first issue raised in this appeal.

**2.** Ploshehanski testified at trial that he enlisted in the United States Air Force in July, 1976, and that he was then stationed in West Germany as a security policeman.

same question.[3] A leading early state court case on point is *People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (1906). In *Jaffe*, the New York Court of Appeals considered whether one could be convicted of an attempt to receive stolen goods when the goods in question had been restored to their owner and actually delivered to the defendant by their owner. The Court held that the attempt conviction was bad because the underlying offense of receiving stolen goods was impossible since the goods had been recovered by their owner. The Court noted that the defendant had the requisite criminal intent but that he could not know the goods were stolen, as required by the statute, since, in fact, they were not stolen. The Court added that the reprehensible nature of one's actions is irrelevant in a criminal case if one has not done the act forbidden by the law.

The earliest apposite reported federal case our research has uncovered is *United States v. DeBare*, 25 F.Cas. 796 (No. 14,935) (D.C.E.D.Wis.1875). In *DeBare*, postage stamps had been stolen by a thief who intended to purvey them to the defendant. The thief was caught, however, and the stamps returned to the local postmaster. Pursuant to a scheme not unlike that in the instant case, the stamps were subsequently sent along to the defendant, who was charged with receiving stolen goods. The District Court noted that the defendant's *mens rea* was precisely that required for conviction under the statute but held that the defendant had not committed the forbidden act. Under the authority of *Schmidt* and *Dolan*, the Court held that the recovered stamps had lost their status as stolen goods and thus could not support a conviction.

We have found three federal appellate cases on point, each from the Third Circuit and each recognizing the validity of the above stated rule. The first case is *Copertino v. United States*, 256 F. 519 (3d Cir. 1919). In *Copertino*, railroad police discovered the theft of certain goods and found where they were hidden. They did not actually seize the goods, however, but rather one officer surveilled the goods while another sought assistance. While merely watching the goods from a distance, the officer observed the defendant loading the contraband into his automobile. The defendant urged upon the Court the rule laid down in *Schmidt, Dolan, Jaffe* and *DeBare*. While the Court "readily concede[d] that the principle invoked is a sound one," *id.* at 521, it found the principle to be of no help to the defendant. The missing element for invoking the rule was actual or constructive possession of the stolen goods by the owner or his agent. The mere surveillance of the goods did not constitute actual or constructive possession by the owner or his agent so the rule did not apply.

*United States v. Cohen*, 274 F. 596 (3d Cir. 1921), is often cited as a leading case in the more modern history of the rule. The facts of *Cohen*, legally indistinguishable from this cause, involved a case of goods which had been diverted from its proper course and readdressed so that it would be delivered to the defendant. A suspicious employee of the carrier, however, turned the case over to his superiors. The carrier's detectives ordered that the case be delivered to the altered address, which led to the defendant's arrest and conviction for receiving stolen goods under the predecessor to 18 U.S.C. § 659. Citing and relying upon *Schmidt, Dolan, Jaffe, DeBare* and *Copertino*, the Court reversed the conviction and expressed the following rule:

> When the actual, physical possession of stolen property has been recovered by the owner or his agent, its character as stolen property is lost, and the subsequent delivery of the property by the owner or agent to a *particeps criminis*, for the purpose of entrapping him as the receiver of stolen goods, does not establish the crime, for in a legal sense he does not receive stolen property.

274 F. at 599

---

**3.** These cases generally deal with statutory codifications of the common law crime of receiving stolen goods. The statutes are all quite similar to the common law definition.

The only relatively recent federal appellate case on point is *United States v. Cawley*, 255 F.2d 338 (3d Cir. 1958).[4] The facts of *Cawley* are nearly identical to those in this case. Two thieves were apprehended by postal inspectors in the process of stealing several packages from a railroad mail shipment. The thieves and packages were taken to the post office and the packages were inventoried. The thieves agreed to cooperate with the inspectors in carrying out their intended plan to sell the packages to the defendant. The defendant, unaware of their apprehension, bought the packages from the thieves under circumstances justifying the inference he knew they were stolen. He was convicted of receiving packages known to be stolen from the mails, in violation of 18 U.S.C. § 1708. The Government conceded and the Court agreed

> that it is a legal principle of long standing that when stolen goods are recovered by the owner or his agent before they are sold, the goods are no longer to be considered stolen, and the purchaser cannot be convicted of receiving stolen goods. 255 F.2d at 340 (footnote omitted).[5]

The Government argued in *Cawley*, however, that the rule did not help the defendant there because the packages were stolen from the railroad and then recovered by postal inspectors who were not agents of the railroad. This, the Government argued, meant the packages had not been recovered by their owner or his agent and thus retained their stolen character even after recovery by the postal inspectors. The Court rejected out of hand this reading of the rule. It held that for purposes of the rule the postal inspectors were agents of the owner. The rule applied whenever the stolen goods were "recovered by the owner or

anyone who has a right to possession or control over them. *See Regina v. Schmidt*, . . . ." *Id.* *See also People v. Rojas*, 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921 (1961). On this reasoning the Court reversed the conviction.

The above cases present this Court with substantial authority pointing toward reversal in this case. In the absence of binding authority, however, it is incumbent upon us to undertake an independent review of the rule in question. We conclude that the rule withstands analysis and we adhere to it.

As noted earlier, the portion of 18 U.S.C. § 659 under which Appellant was convicted requires the Government to prove beyond a reasonable doubt that the defendant received *stolen goods*. Just as did the judges of nineteenth century England, we do not believe the words "stolen goods" include goods that were stolen but recovered by their owner or his agent. All would agree that at some point in time the goods in this case ceased being stolen goods.[6] We must decide at what point the goods lost that status in contemplation of the law. We feel the best and only workable rule is the common law rule—viz, the goods lost their stolen character immediately upon being recovered by the owner or his agent. Trying to choose some later point in time to support the conviction in this case would necessitate a strained reading of the words involved and would yield unnecessary uncertainty.

■ We are bolstered in this conclusion by two time-honored rules of statutory construction. First, we find support in the general rule that criminal statutes are to be strictly construed against the Government. *Rewis v. United States*, 401 U.S. 808, 812,

---

4. The existence of the rule was noted with apparent approval in yet another Third Circuit case in which the Court said it was not at all relevant. *United States v. Bryan*, 483 F.2d 88, 91 (3d Cir. 1973). *Cf. United States v. Hair*, 356 F.Supp. 339 (D.D.C.1973).

5. The Court cited *Schmidt* and *Dolan* for the long standing character of the rule and relied heavily upon its earlier decisions in *Copertino* and *Cohen*.

6. Lord Campbell pointed out in *Regina v. Dolan*, 29 Eng.Law & Eq. at 535, that the only other possible rule would be that once goods are stolen they can support a conviction for receipt of stolen goods at any subsequent point in their history. We agree that such a rule would go too far.

91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955). *See* J. G. Sutherland, Statutes and Statutory Construction § 5604 (1943 ed., 1973 Supp.). This salutary rule is based upon notions of requiring the Government which drafts the statute to give full and fair notice of what the law intends. It also reflects the respect given to personal liberty by permitting loss of liberty only in tightly defined circumstances. The rule operates in this case to cause us to prefer Appellant's construction of 18 U.S.C. § 659 over the Government's version.

█ The second relevant rule of statutory construction is that statutes are to be interpreted with reference to the common law and generally be given their common law meaning absent some indication to the contrary. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952); *Thomas v. United States*, 189 F.2d 494, 501 (6th Cir.), *cert. den.* 342 U.S. 850, 72 S.Ct. 78, 96 L.Ed. 641 (1951). *See* J. G. Sutherland, Statutes and Statutory Construction § 5301 (". . . reference to common law principles may provide a valuable clue as to whether a particular situation is controlled by the statute. . . .") *and* § 5304 (". . . federal statutes must be interpreted in light of the common law" of England and the states.) (1943 ed., 1973 Supp.). The language of 18 U.S.C. § 659 closely resembles the common law definition of receiving stolen goods,[7] with the obvious exception of the federal jurisdictional elements. The common law of England and the states precludes conviction of receiving stolen goods on facts like those

in the instant case. Thus, this rule of statutory construction reinforces our reversal in this case.

Some cases have justified the result we reach here by a policy determination that it helps prevent entrapment of the unwary.[8] While we do not see any such rationale expressed in any of the early cases, it is consistent with the development of the rule. This Court cannot find much support for the rule in this rationale, however, because of the prevailing view of the entrapment defense in the federal courts. The Supreme Court has repeatedly held that entrapment is a valid defense only when the action of Government agents "implants the criminal design in the mind of the defendant." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973).[9] In this case and most of the other cases discussed herein the defendant was predisposed to commit the crime involved and would have no valid entrapment defense. The factual framework involved here is such that unwary persons are not entrapped so our result does not find support in a fear of entrapment. An alternative view of entrapment focuses not on the defendant's predisposition to commit the crime but instead on police conduct. Under this view, if the criminal act is instigated by the Government then the defendant has a valid entrapment defense irrespective of his predisposition to commit the crime. The facts of this and similar cases dovetail well with this entrapment defense. This view of entrapment, however, despite repeated urgings, has been soundly rejected by the Supreme Court.[10] Fear of entrapment, so defined, is

---

7. *See* 3 & 4 William & Mary c. 9 § 4; 5 Anne c. 31 §§ 5 & 6; 1 Anne c. 9 § 2.

8. *See, e. g., United States v. Bryan*, 483 F.2d 88, 91 (3d Cir. 1973); *United States v. Cohen*, 274 F. 596, 599 (3d Cir. 1921).

9. This view of entrapment was adopted by the Court in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) and followed in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), for the most recent development of this view.

10. This view was urged in *Sorrells v. United States*, 287 U.S. 435, 453–59, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (Roberts, J., concurring), in *Sherman v. United States*, 356 U.S. 369, 378–85, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring), and in *United States v. Russell*, 411 U.S. 423, 436–39, 439–50, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (Douglas, J., dissenting; Stewart, J., dissenting). In each case the majority has rejected this so-called objective view which focuses on police conduct and opted for the so-called subjective view focusing on the defendant's predisposition. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

thus not a proper consideration for this Court. We prefer to rest our disposition on the firmer foundation of statutory construction outlined above.

The government in this case has attacked the common law rule by contending that it punishes efficient police work. It points to the important societal value in apprehending the fences who finance the theft of so much property today. In particular, the Government relies upon *United States v. Egger*, 470 F.2d 1179 (9th Cir. 1972). In *Egger*, two thieves robbed a bank. They were caught soon thereafter but the FBI was unaware of the location of one portion of the stolen money. One of the robbers, who decided to cooperate with the FBI, received a communication from one of the defendants (an attorney who had earlier represented her) telling her to surreptitiously obtain the hidden money. The robber followed these instructions and recovered the hidden money but in the presence of FBI agents. These agents then recorded the serial numbers of the stolen bills and accompanied the robber as she delivered the money to the defendant. The defendant was convicted of knowing possession of money taken in a bank robbery. 18 U.S.C. § 2113(c).

The Ninth Circuit affirmed this conviction. It held the well-settled rule on stolen but recovered property, as directly quoted from *Cohen*, inapposite because the "FBI never assumed 'actual, physical possession' of the stolen property." 470 F.2d at 1181. Rather, the Court held, the FBI's traveling with the robber and counting and inventorying the money was mere surveillance akin to that approved in *Copertino*. The Court said "[e]xtension of the common law rule to bar this prosecution would serve no useful purpose, and would merely create a fringe benefit for criminals." *Id.*

We are very sympathetic to the Government's desire to apprehend fences. Their social disutility is notorious. We cannot agree with the Government's position in this case, however, and we are unpersuaded by *Egger*.[11] The Government's arguments ignore the relevant statutory requisite of *stolen* goods. We fully realize that the beneficiaries of the rule espoused here likely have the precise culpable state of mind required for conviction of receiving stolen goods. Our law does not punish bad purpose standing alone, however; instead we require that *mens rea* accompany the *actus reus* specifically proscribed by statute. It is one of the most fundamental postulates of our criminal justice system that conviction can result only from a violation of clearly defined standards of conduct. We must apply this principle evenhandedly and not be swayed by our attitudes about the moral culpability of a particular defendant. It is the function of legislatures, not courts, to condemn certain conduct. Petitions to punish reprehensible conduct must be addressed to the Congress and not this Court. Being bound by the current statutory language, this case simply does not involve the proscribed criminal act.

The statement in *Egger* that this result is a "fringe benefit for criminals" begs the question, for one is not a criminal until he combines the requisite *mens rea* and *actus reus*. *Egger* also falls short in its statement that the FBI agents in that case never assumed "actual, physical possession" of the stolen money even though they counted and inventoried it. On oral argument before this Court counsel for the Government conceded this statement was based upon tortured reasoning. We agree.

We see at least three alternatives open to the Government in its attempt to apprehend fences when faced with facts like those here.[12] First, it can petition the Con-

---

**11.** With the exception of *Barnes v. United States*, 313 A.2d 106 (D.C.App.1973), *Egger* appears to stand alone in its refusal to follow the common law rule. Neither of these cases rejected the rule but rather struggled to distinguish it.

**12.** A fourth alternative is possible in state prosecutions. Many states have charged persons in Appellant's position with attempted receipt of stolen goods. There is a split of authority on the propriety of this. *Compare People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (1906) (no conviction allowed for attempt since underlying offense

gress for a statute clearly drawn to encompass the disfavored activity.[13] Second it can employ the method approved in *Copertino*[14] of surveilling the stolen goods until delivered to the fence. Third, the Government can charge fences under 18 U.S.C. § 371, the general conspiracy statute, in cases where it can show the necessary elements of a conspiracy.[15] The Government may not be enthusiastic about any of these proposed alternative courses but the record in this case and the current state of the law cannot yield the result it desires.

■ In summary, we hold that, in accord with the common law rule, one cannot be convicted of receiving stolen goods when actual physical possession of the stolen goods has been recovered by their owner or his agent before delivery to the intended receiver. We further hold, also in accord with the common law rule, that the term "agent" means any person with a right to possession or control over the goods.[16] The judgment of conviction is reversed.

---

would not be a crime) *with People v. Rojas*, 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921 (1961) (conviction allowed for attempt despite underlying offense being impossible). *See* 85 A.L.R.2d 259. We need not enter this debate as there is no comprehensive attempt statute in Title 18 of the United States Code nor is attempted receipt of stolen goods specifically proscribed.

**13.** We note by way of example only Colorado Revised Statutes § 18–4–410 ("Theft By Receiving"). This statute proscribes receiving property that one mistakenly *believes* is stolen, whether stolen or not. *People v. Holloway*, 568 P.2d 29 (Colo.1977). In *Holloway* the Court noted that this statute replaced a more traditional receiving stolen goods statute and that the legislature clearly intended to broaden the acts covered by the statute.

Another possible change in the law would be enactment of a comprehensive attempt statute. This may or may not be interpreted to apply to

facts like those in this cause. *See* note 12, *supra. Cf. State v. Neihuser*, 21 Or.App. 33, 533 P.2d 834 (1975), which approved conviction of attempted receipt of stolen goods on similar facts since the relevant attempt statute explicitly stated that impossibility is not a defense to an attempt charge. *Cf. also* Ohio Revised Code § 2923.02(B).

**14.** *See also* the opinion of Martin, B., in *Regina v. Schmidt*, L.R. 1 Cr.Cas.Res. at 17.

**15.** The record in this case suggests a conspiracy charge would have been supportable against Logan if not Appellant. *But cf. People v. Rojas, supra*, for some difficulties possible in a conspiracy charge.

**16.** This will generally work to include all types of police officers, such as the Conrail police in the instant case. *See Cawley, Schmidt* and *Rojas, supra.*