STATE OF NORTH CAROLINA v. BRUCE GILBERT HAGEMAN

No. 8121SC920

(Filed 16 March 1982)

### 1. Receiving Stolen Goods § 5.1— sufficiency of evidence

The evidence was sufficient to go to the jury in a prosecution for receiving stolen goods where the jury could determine from what a witness told defendant that defendant had reasonable grounds to believe that a ring was stolen and that, in purchasing the ring from the witness, defendant had the intent necessary to constitute the crime of receiving stolen goods.

### 2. Criminal Law § 128— failure to set aside verdict—discretionary

A trial court's decision concerning whether or not to set aside verdicts involves the exercise of the court's discretion, is not a question of law and is not, therefore, reviewable.

### 3. Criminal Law § 7; Receiving Stolen Goods § 7— entrapment—insufficient evidence

Defendant's motions to dismiss and to set aside the verdict on grounds of entrapment were properly denied where there was no evidence of an on-going relationship of trust or of repeated requests for defendant to perform illicit activity, and where, at the request of the police who had reason to suspect defendant's purchase of stolen goods, a witness for the State approached defendant once concerning the purchase of a jade ring and, a short while later, concerning the purchase of silverware. There was no evidence that the defendant was induced to commit a crime not contemplated by him, and there was, therefore, no entrapment as a matter of law.

### 4. Criminal Law § 112.4— refusal to instruct on law of circumstantial evidence— no error

There was insufficient circumstantial evidence relevant to defendant's guilt or innocence to require the trial judge, upon request, to instruct on the law of circumstantial evidence.

### 5. Criminal Law § 121— instructions on entrapment proper

In a prosecution for receiving stolen goods, the instructions concerning entrapment were sufficient on the concept that, when entrapment is an issue, the question of defendant's willingness, or predisposition to commit the crime is raised, even though the word "predisposition" was not used. Further, the State is not required to prove beyond a reasonable doubt that there was no entrapment.

### 6. Receiving Stolen Goods § 1.1— stolen goods intercepted by police—character of goods changed—attempting to receive stolen goods verdict proper

Where defendant was indicted for receiving stolen goods and, from the evidence presented, the jury could have found beyond a reasonable doubt (1) that silver was stolen pursuant to a breaking and entering, (2) that the police took possession of the silver but returned it to the person responsible for

stealing the silver for him to take to defendant, and (3) that defendant, with reasonable grounds to believe the silver had been feloniously stolen or taken, purchased it from that person, defendant could have been convicted of attempting to receive stolen goods. Even though the stolen goods were actually intercepted and taken in by police and such interception changed the character of the goods so that no receipt of stolen goods was possible, the defendant nevertheless could have been convicted of attempting to receive stolen goods. G.S. § 15-170.

**7. Receiving Stolen Goods § 1.2— attempt to receive stolen goods misdemeanor**

An attempt to receive stolen goods is a misdemeanor, not a felony, therefore, a conviction for felonious attempt to receive stolen goods cannot stand.

Judge BECTON dissenting in part and concurring in part.

APPEAL by defendant from *Mills, Judge*. Judgments entered 2 April 1981 in Superior Court, FORSYTH County. Heard in the Court of Appeals on 9 February 1982.

Defendant was charged in Case Number 80CR51100 with the misdemeanor receipt of stolen goods, a jade ring. After conviction and judgment in Forsyth County district court, he appealed to superior court. The trial of the misdemeanor case was consolidated with trial for defendant's indictment on a felony charge (Case Number 80CR52198) with receiving stolen goods, sterling silver flatware, after having reasonable grounds to believe that said property had been stolen pursuant to a breaking and entering and larceny.

At trial, the State's evidence tended to show that, on or about 5 December 1980, Stephon Johnson and Tyrone Oliver broke into the home of Elizabeth Prince and stole silverware, rings, and jewelry. Some of the stolen goods, including a watch, were sold at the Metal Mart, owned by defendant. While attempting to sell more of the stolen merchandise in Greensboro, Johnson and Oliver were arrested. The Winston-Salem Police Department took possession of the sterling silver flatware.

While out of jail on bond, Johnson returned to defendant's Metal Mart where he attempted to obtain money to get Oliver out of jail. Defendant stated that he had no money. On 18 December, Johnson returned to the Winston-Salem Police Department where he tried to turn in a jade ring which had also been taken from Mrs. Prince's home. The police refused to accept the

ring, but they worked out an agreement with Johnson whereby Johnson, wired with a transmitter and microphone, would return to the Metal Mart to sell the ring and the silver to defendant. Johnson testified that, when he sold the ring to defendant, he informed the defendant that it was "hot." The tape recording showed the following conversation:

MR. JOHNSON: Hey man, what 'cha been up to?

MR. HAGEMAN: Not much, how about you? Sticking in there?

MR. JOHNSON: Well, I'll let you know. Check it out man, I got a ring, man, it ain't got no kind of identification. I mean, no kind of signs on it. One that you know, I went back and found that one. I lost a lot of stuff man, when I was trying to get away, you know.

MR. HAGEMAN: Okay.

MR. JOHNSON: But that was still there. I got some silver if you want it, man.

. . .

MR. JOHNSON: . . . Well, I've got some silver, man, but I just don't want the police bothering me, you know how they is.

MR. HAGEMAN: Oh, sure.

MR. JOHNSON: Yeah, it's hot.

MR. HAGEMAN: Man, I don't know, I'd rather not.

MR. JOHNSON: Check it out, check it out. I mean it's marked sterling, it ain't got nobody's initials on it.

MR. HAGEMAN: Yeah, but still man, the police are sly people, man I—

MR. JOHNSON: They won't know nothing, man, they won't know nothing.

MR. HAGEMAN: Didn't you sell some pocket watches?

MR. JOHNSON: Yeah.

MR. HAGEMAN: They caught a friend?

MR. JOHNSON: They did, they caught a friend, they still got him, they got him in Greensboro.

MR. HAGEMAN: He hasn't fessed up to it or anything?

.   .   .

MR. JOHNSON: I've been doing all right for the last — soon as I got out of jail, man, but I got to go to court next week, cause my lawyer says as long as they didn't catch us with nothing we're scot-free.

MR. HAGEMAN: Right.

MR. JOHNSON: So we're scot-free.

MR. HAGEMAN: Right, well, that's good, that's good, man. It's not worth the hassle, I mean I hope for you you don't ever get caught.

MR. JOHNSON: Hey, I'm gonna be all right, you know, I'll be all right, you know, I'm gonna still — Winston-Salem.

MR. HAGEMAN: You're all right, you're okay. Well, all right, you've got $10.

MR. JOHNSON: Look, I give you a false name this time, you gotta —

MR. HAGEMAN: Don't tell me that.

.   .   .

MR. JOHNSON: . . . I'm gonna bring the silver back, is that all right?

MR. HAGEMAN: Well —

MR. JOHNSON: They ain't gonna catch up with that silver, man.

MR. HAGEMAN: I don't know, it's — I just feel funny.

MR. JOHNSON: Hey, you can get rid of it, right?

MR. HAGEMAN: You got a friend, don't ya? Send him on in.

MR. JOHNSON: All right, if I can find him.

Upon Johnson's return with the silver, the taped conversation continued in pertinent part:

MR. HAGEMAN: What ya got?

MR. JOHNSON: I got some silver.

MR. HAGEMAN: Okay, let me weigh it up.

MR. JOHNSON: This be where I broke in the house and took it.

MR. HAGEMAN: Oh, don't tell me nothing.

MR. JOHNSON: Okay, this is where I broke in a house so you gotta watch out, right?

MR. HAGEMAN: Right.

.　.　.

MR. JOHNSON: When I broke in the house, there's some that I hid. I got another box. I gotta a friend gonna bring it. I can get another friend to bring it a little bit more at a time if you want it that way. I just gotta make sure it cools down. All of it's silver, man. I sold some to your man up there yesterday.

MR. HAGEMAN: Where? Here?

MR. JOHNSON: Right up there. You're not the only person I know.

MR. HAGEMAN: Yeah.

MR. JOHNSON: I know a whole lot of um, you know. All of it's silver, man.

MR. HAGEMAN: Man, I got a kind of funny feeling now, I don't know.

MR. JOHNSON: You'll be all right, man, you'll be all right.

.　.　.

MR. HAGEMAN: Well, I'm gonna have to check a few of those pieces too. These here are no good. . . .

State v. Hageman

MR. JOHNSON: Well, I might could take them probably somewhere else and sell um, that ain't no good, might be try to get over on somebody, go find a dummy, ya know.

MR. HAGEMAN: Yeah, there's a lot of dummies out there.
. . .

MR. JOHNSON: . . . You didn't write my name down last time, did ya?

MR. HAGEMAN: No, we got rid of that ticket.

MR. JOHNSON: All right. You don't know me and I don't know you.

MR. HAGEMAN: Hey, that's it, man, and if you ever come back here and you're caught, I don't know you, understand?

MR. JOHNSON: Right. You ain't gonna call the police on me soon as I leave, are you?

MR. HAGEMAN: No, cause I know too much already.

MR. JOHNSON: On who, me?

MR. HAGEMAN: No, I mean I know too much, in other words, you know, if I buy it I can get—but even if I call the police down here, they'll still say, well, Mr. Hageman, you gave him some money.

MR. JOHNSON: Right, right, so you can't do nothing. They'll get you for buying stolen goods. But they won't know it's stolen, man, just go on and do what you did with the watches, you know the watches and stuff, do them like you did the watches and it will be all right. In about exactly 45 minutes I got a guy coming down here, you want him to bring the whole box or just a little bit at a time? I can get another guy to come too.

MR. HAGEMAN: Well, I don't want to know who they are, okay?

MR. JOHNSON: You ain't got to know who they are, they just gonna walk in here, show them to you and it's just like me and you, you know?

MR. HAGEMAN: Right.

MR. JOHNSON: Oh, I got—you ain't waiting on no police, are you?

MR. HAGEMAN: No, man, I'm just worried, that's all.

MR. JOHNSON: You all right, you all right cause where I broke in the place, man, the lady dropped the charges . . . then didn't show up in court yesterday. Know what I mean? She dropped the charges. She didn't need all that back. All she wanted was her insurance, that's all.

MR. HAGEMAN: Hey, I got a lot of friends at the police force and man, if this ever got out.

MR. JOHNSON: They don't know nothing, man.

.   .   .

Defendant paid Johnson for the silverware and, shortly after Johnson left defendant's store, the police entered and arrested the defendant.

The defendant offered evidence tending to show that he attended church regularly and that he had a good character and reputation within his community. Taking the stand on his own behalf, defendant testified that he did not recall that Johnson told him the jade ring was stolen and that initially he did not believe Johnson when he told him the silverware was "hot." After Johnson's first trip during which defendant bought the jade ring, defendant called the "hot line," a police telephone number on which police would read a list of items that had recently been stolen. Defendant asked Officer Reaves, who was operating the line to tell him of items stolen within the past 12 to 24 hours. The list did not contain descriptions of the watches, the ring, or the silver defendant was to buy. Defendant requested that Reaves call him to give him details on some other items Reaves had mentioned. Before Johnson returned with the silver, Reaves returned defendant's call to say that he had no further details. Defendant stated to Reaves that he, the defendant, might have to call him later if someone came in with some silver. In explaining the incriminating statements heard on the tape, defendant testified that he was confused and frightened and that he made the statements to gain Johnson's confidence.

The State offered rebuttal evidence by Officer Reaves who corroborated defendant's testimony about the "hot line" calls but who further testified that defendant did not inform him that he had purchased a jade ring from a man claiming to have stolen it. Reaves also stated that at no time did the defendant refer to Johnson's statements about stolen silver or to defendant's fear for his safety and need for police protection.

In Case Number 80CR51100, the jury found defendant guilty of attempted non-felonious receiving of stolen goods, and in Case Number 80CR52198, it found him guilty of attempted felonious receiving of stolen goods. From judgments imposing consecutive prison terms, defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Robert L. Hillman, for the State.*

*William B. Gibson for defendant appellant.*

HEDRICK, Judge.

By his first four assignments of error, defendant argues that the trial court erred in denying his motions for dismissal of the charges, for nonsuit, and for setting aside the verdicts. As to the motions to dismiss and the motion for nonsuit, defendant contends that there was insufficient evidence (a) that he had reasonable grounds to believe the ring to have been stolen at the time he bought it and (b) that he acted with a dishonest purpose in receiving either the ring or the silverware. On the question of setting aside the verdict, defendant contends that the verdict was against the greater weight of the evidence concerning the elements set forth in (a) and (b) above. We reject defendant's contentions.

[1] Upon the motion to dismiss and its equivalent motion to grant a nonsuit in a criminal action, all of the evidence favorable to the State, whether competent or incompetent, must be deemed true; discrepancies and contradictions therein are disregarded, and the State is entitled to every favorable inference of fact reasonably deduced from the evidence. *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977). In reviewing the record in the present case, we find that the evidence was clearly sufficient to take the case to the jury. Viewing the evidence in the light most favorable to the State, we believe the jury could determine from

what Johnson told defendant that defendant had reasonable grounds to believe that the ring was stolen and that, in purchasing the ring, defendant had the intent necessary to constitute the crime. Johnson stated that he had a ring with "no kind of identification." He said, "I mean, no kind of signs on it. One that you know, I went back and found that one. I lost a lot of stuff man, when I was trying to get away, you know." Furthermore, Johnson talked extensively about the silver he had stolen thereby giving the defendant additional grounds to be suspicious about the origin of the ring. Despite this, however, the record discloses that the defendant, before the police entry, had already disposed of the jade ring.

[2] In defendant's motion to set aside the verdicts, defendant contended the verdicts were against the greater weight of the evidence. Under this motion, the trial judge has discretionary authority to set aside the verdict and order a new trial whenever it appears to him that the verdict is contrary to the greater weight of the credible testimony. *State v. Shepherd*, 288 N.C. 346, 218 S.E. 2d 176 (1975). The decision of the court involves the exercise of the court's discretion, is not a question of law and is not, therefore, reviewable. *Roberts v. Hill*, 240 N.C. 373, 82 S.E. 2d 373 (1954). The two assignments of error based on defendant's motions to set aside the verdict are overruled.

[3] In a later argument, defendant presents an additional reason that the motions to dismiss and to set aside the verdict were erroneously denied. Citing *State v. Stanley*, 288 N.C. 19, 215 S.E. 2d 589 (1975), he contends that he was entrapped as a matter of law. With this contention we disagree. In the *Stanley* case, the Supreme Court held that the defendant, seventeen years old, was entrapped as a matter of law when an undercover policeman befriended him for several weeks and repeatedly asked defendant, without defendant's encouragement, to buy him drugs. In its analysis, the Court defined entrapment as " 'the inducement of one to commit a crime not contemplated by him, for the mere purpose of instituting a criminal prosecution against him.' " *State v. Stanley, supra* at 27, 215 S.E. 2d at 594 citing 21 Am. Jur. 2d Criminal Law § 143. " 'Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law enforcement officials.' " *State v. Stanley, supra* at 30, 215 S.E. 2d at 596, quoting *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819,

821, 2 L.Ed. 2d 848, 851 (1958). We find the factual circumstances of this case before us distinctly different from *Stanley*. Here, there was no evidence of an on-going relationship of trust or of repeated requests for defendant to perform illicit activities. At the request of the police who had reason to suspect defendant's purchase of stolen goods, Johnson approached defendant once with the jade ring and, a short while later, with the silverware. There was no evidence that the defendant was induced to commit a crime not contemplated by him, and there was, therefore, no entrapment as a matter of law. Defendant's motions to dismiss and to set aside the verdict were properly denied.

By his assignments of error numbered 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26, based on twenty-nine exceptions duly noted in the record, defendant contends that the court erred to his prejudice by excluding evidence concerning the origin and use of the hot line, the defendant's use of the hot line both before and after his arrest, a typical transaction in defendant's store, threatening phone calls defendant had received, his previous involvement in the apprehension of criminals, his intentions at the time of the transactions with Johnson, and a conversation he had with his wife. Defendant argues that such evidence was competent to show "defendant's state of mind, motive, intent, knowledge and purpose, *i.e.*, his lack of *mens rea*." In support of his theory, defendant relies heavily on the bard and quotes Mark Antony's famous eulogy, "The evil that men do lives after them/The good is oft interred with their bones." While we pass no judgment on Shakespeare's comments on good and evil, we certainly do not find them controlling, and we reject defendant's argument that the exclusion of the aforementioned evidence was prejudicial.

We have carefully examined each of the twenty-nine exceptions upon which these ten assignments of error are based and find that (1) a majority of exceptions were to the exclusion of evidence which was clearly irrelevant and immaterial; (2) much of the evidence defendant contends was excluded, having not been stricken, was not, therefore, excluded; (3) much of the evidence defendant contends was excluded was elsewhere clearly placed before the jury; and (4) much of the excluded testimony was never tendered, and this Court has no way to determine whether such exclusion was prejudicial to defendant. We find the assignments of error without merit.

The next question raised by defendant pertains to four assignments of error involving the trial court's failure to charge the jury on attempt, circumstantial evidence, motive, and evidence of similar acts of the defendant. While we agree with defendant that the trial court erroneously defined the attempt to receive stolen goods by using the definition of actual receipt of stolen goods, we find that this error inured to the benefit of defendant and is not, therefore, reversible error.

[4] Furthermore, we do not find prejudicial error in the trial court's refusal to instruct the jury on the law of circumstantial evidence. Our courts have held repeatedly in cases where no instructions were requested that, when the State relies primarily on direct evidence to establish its case, it is not error to fail to instruct the jury on the law of circumstantial evidence. *See State v. Griffin*, 18 N.C. App. 14, 195 S.E. 2d 569 (1973). In the present case, defendant did request instructions on the law of circumstantial evidence. Nevertheless, we believe that, in view of the evidence properly admitted for both the State and the defendant, there was insufficient circumstantial evidence relevant to defendant's guilt or innocence to require the requested instructions.

Defendant's argument that the trial court should have instructed on the issue of defendant's motive is likewise rejected. Defendant has failed to show, and we cannot find, that the instructions requested, if given, would have led to a different result in defendant's trial. *See* G.S. § 15A-1442(4)(d), 1443(a).

As to defendant's contention that the court should have instructed on the evidence of specific good acts done by defendant, we find that such evidence was not properly admissible, *State v. Handsome*, 300 N.C. 313, 266 S.E. 2d 670 (1980), and instructions were not, therefore, necessary.

[5] Defendant next presents the question of whether the trial court erred when it refused to instruct the jury on the predisposition of the defendant to commit the crime and on the shifting of the burden of proof on the issue of entrapment. The record reveals the following pertinent instructions:

> The defendant contends entrapment. Entrapment occurs when a person acting on behalf of a governmental agency induces the defendant to commit a crime not contemplated by

the defendant for the purpose of instituting a criminal charge against him. Entrapment is a complete defense to crime charged. The burden of proof of entrapment is upon the defendant. However, the defendant is not required to prove entrapment beyond a reasonable doubt but only to your satisfaction. For you to find that the defendant was entrapped, you must be satisfied of three things: That the criminal intent to commit an attempt to receive stolen goods did not originate in the mind of the defendant. Second, that the defendant was induced by Stephon Johnson to attempt to receive stolen goods. Merely providing an opportunity to commit an attempted receiving stolen goods by Bruce Hageman would not be sufficient inducement—merely providing an opportunity to commit an attempted receiving stolen goods by Stephon Johnson would not be sufficient inducement. It must appear that Stephon Johnson used persuasion or trickery to cause the defendant to attempt to receive stolen goods, which he was not otherwise willing to do, and third, that Stephon Johnson acted on behalf of the Winston-Salem Police Department.

Therefore I charge that if you are satisfied from the evidence that the criminal intent did not originate in the mind of Bruce Gilbert Hageman and that Stephon Johnson induced Bruce Gilbert Hageman by persuasion or trickery to commit the crime of attempted receiving stolen goods, which he, Bruce Hageman, was not otherwise willing to do, and that Stephon Johnson acted on behalf of the Winston-Salem Police Department, you must return a verdict of not guilty.

Although the word "predisposition" is not used, we find these instructions sufficient on the concept that, when entrapment is at issue, the question of defendant's willingness, or predisposition, to commit the crime is raised.

Moreover, this Court, in previous cases, has rejected defendant's argument that, under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed. 2d 508 (1975), the State is required to prove beyond a reasonable doubt that there was no entrapment. *State v. Wilkins*, 34 N.C. App. 392, 238 S.E. 2d 659, *disc. rev. denied*, 294 N.C. 187, 241 S.E. 2d 516 (1977); *State v. Braun*, 31 N.C. App. 101, 228 S.E. 2d 466, *disc. rev. denied and appeal dismissed*, 291 N.C. 449, 230 S.E. 2d 766 (1976).

[6]   Defendant's next argument is that it was legally impossible for him to have been convicted of feloniously receiving or attempting to receive the silver, in Case Number 80CR52198, because the silver had, in fact, lost its stolen character. Citing *People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (1906), the defendant argues that the silver had lost its stolen character because it had been recovered by the police and that he, therefore, could not be guilty of receiving or attempting to receive stolen goods. In *Jaffe*, the New York Court of Appeals held it legally impossible to receive stolen goods or to attempt to receive stolen goods when the goods in fact were not stolen. We disagree. Instead, we adopt the reasoning of the Supreme Court of California, in *People v. Rojas*, 55 Cal. 2d 252, 358 P. 2d 921, 10 Cal. Rptr. 465 (1961), where it held that, if stolen goods were actually intercepted and taken in by the police and such interception changed the character of the goods so that no receipt of stolen goods was possible, the defendant nevertheless might be convicted of attempting to receive stolen goods. The California court stated that

> the criminality of the attempt is not destroyed by the fact that the goods, having been recovered by the commendably alert and efficient action of the . . . police, had, unknown to defendants, lost their "stolen" status. . . . In our opinion the consequences of intent and acts such as those of defendants here should be more serious than pleased amazement that because of the timeliness of the police, the projected criminality was not merely detected but also wiped out.

*Id.* at 258, 358 P. 2d at 924, 10 Cal. Rptr. at 468.

In North Carolina, one can be convicted of attempting to receive stolen goods even though he was only indicted for receiving stolen goods. G.S. § 15-170; *State v. Parker*, 224 N.C. 524, 31 S.E. 2d 531 (1944). Thus, while the defendant in the present case was indicted for the actual receipt of stolen goods, we find no error in the trial court's submission of the issue of attempted receipt of stolen goods. From the evidence presented, the jury could have found beyond a reasonable doubt (1) that the silver was stolen pursuant to a breaking and entering, (2) that the police did take possession of the silver but returned it to Johnson for him to take to defendant, and (3) that defendant, with reasonable grounds to believe the silver to have been feloniously stolen or taken, purchased it from Johnson.

State v. Hageman

The stolen jade ring presents a somewhat different question. From the record, the evidence appears uncontroverted that the police, although offered the ring, never accepted it. Rather, the police elected to let Johnson retain the ring while they conducted surveillance of Johnson and his sale of the ring to defendant. Under these facts, we find that the ring had not, therefore, come into either the actual or constructive possession of the owner or her agent, *Copertino v. United States*, 256 F. 519 (3d Cir. 1919), and that the ring never lost its stolen status. Defendant, in purchasing the ring, was, therefore, receiving (not merely attempting to receive) a stolen good. The instruction to the jury on the issue of attempted receipt of the stolen ring was error, but because defendant could have been convicted of actual receipt, neither it nor the verdict of attempt was error prejudicial to the defendant.

[7] Finally, defendant argues that the attempt of receiving stolen goods is a misdemeanor, not a felony, and that defendant's conviction for the felonious attempt to receive the stolen silver in Case Number 80CR52198 cannot stand. We agree. Absent statutory provisions to the contrary, an attempt to commit a felony is a misdemeanor. *State v. Hare*, 243 N.C. 262, 90 S.E. 2d 550 (1955). The only statutory exception possibly applicable to this rule in the present case in G.S. § 14-3(b) which provides that misdemeanors which are "infamous, done in secrecy and malice, or with deceit and intent to defraud," are punishable as felonies. We do not believe that an attempt to receive stolen goods falls within this class of misdemeanors. Hence, we vacate the judgment in Case Number 80CR52198 with directions that superior court resentence defendant as for a misdemeanor.

In summary, in Case Number 80CR51100, attempted receipt of stolen goods (the jade ring), there is no error.

In Case Number 80CR52198, attempted receipt of stolen goods (silverware), the judgment is vacated and the cause is remanded to superior court for resentencing as for a misdemeanor.

No error in part; vacated and remanded in part.

Judge HILL concurs.

Judge BECTON concurs in part and dissents in part.

Judge BECTON, dissenting in part and concurring in part.

I have no quarrel with the majority's resolution of 80CRS51100 — defendant's conviction of receiving a stolen ring. However, believing that the sterling silver items lost their character as stolen goods when they were recovered *and retained for twelve days by the police,* I dissent from that portion of the majority opinion finding "no error in the trial court's submission of the issue of attempted receipt of stolen goods." *Ante,* page 14. I am not persuaded, as is the majority, by the "reasoning of the Supreme Court of California, in *People v. Rojas,* 55 Cal. 2d 252, 10 Cal. Rptr. 465, 358 P. 2d 921 (1961)" that although it is legally impossible *to receive stolen property* after it has been recovered by the police or its owner, a defendant can nevertheless be convicted of *attempting to receive stolen property* which has been recovered by the police.

In the absence of a statute proscribing the receipt of goods that one mistakenly believes are stolen, whether stolen or not, I believe the sounder view to be that set forth in *People v. Jaffe,* 185 N.Y. 497, 78 N.E. 169 (1906) — that is, when the underlying offense is not a crime, there can be no conviction for attempting to commit that underlying offense.

The *Rojas* Court does correctly state the controlling principle: stolen property which the police have recovered is presumed to be "held by the police in trust for, or for the account of, the owner." 55 Cal. 2d at 258, 10 Cal. Rptr. at 469, 358 P. 2d at 925. Stated differently:

> When the actual, physical possession of stolen property has been recovered by the owner or his agent, its character as stolen property is lost, and the subsequent delivery of the property by the owner or agent to a particeps criminis, for the purpose of entrapping him as the receiver of stolen goods, does not establish the crime, for in a legal sense he does not receive stolen property.

*United States v. Cohen,* 274 Fed. 596, 599 (3rd Cir. 1921). This principle "had its genesis in two nineteenth century English cases. *Regina v. Schmidt,* L. R. 1 Cr. Cas. Res. 15 (1866); *Regina v. Dolan,* 29 Eng. Law & Eq. 533 (1855)." *United States v. Monasterski,* 567 F. 2d 677, 679 (6th Cir. 1977). *See also* 76 C.J.S. *Receiving*

*Stolen Goods*, § 5(a)(2). This principle has been stated by our Supreme Court in dictum in *State v. Collins*, 240 N.C. 128, 81 S.E. 2d 270 (1954). Although the issue in *Collins* was whether the goods had ever been stolen, not whether they had lost that status, the *Collins* Court, quoting *Farzley v. State*, 231 Ala. 60, 61, 163 So. 394, 395 (1935) said: " 'But it is essential to the crime here charged [receiving stolen property] that the goods received by defendant were stolen *and retained that status* until they were delivered to defendant.' " *Id.* at 131, 81 S.E. 2d at 272 (emphasis added).

The majority does not seek to apply this controlling principle of law to the facts of this case; rather, the majority suggests, on policy grounds, that " 'the commendably alert and efficient action of the . . . police' ", *ante* page 13, in ferreting out criminality is the polar star and the controlling consideration. The majority also suggests that the general rule that criminal statutes are to be strictly construed against the State should be relaxed.

The statute under which defendant was charged makes it a crime to receive stolen goods. At some point in time, recovered goods must cease being stolen goods. *See United States v. Dove*, 629 F. 2d 325 (4th Cir. 1980) and *United States v. Monasterski*. I believe that "the best and only workable rule is the common law rule — *viz*, the goods lost their stolen character immediately upon being recovered by the owner or his agent." *Monasterski*, 567 F. 2d at 681. *See also United States v. Cawley*, 255 F. 2d 338 (3rd Cir. 1958).

The *Rojas* rule which allows the police to capture and hold recovered goods for some unspecified period of time without the goods losing their character as stolen goods is unworkable. Moreover, to the extent that the police in the *Rojas* case were mere conduits through which the stolen goods passed *immediately and directly* to the defendants therein, *Rojas* is factually distinguishable. The *Rojas* Court considered the following facts, all of which occurred within one day: A theft; an arrest; a recovery of stolen goods; an agreement by the person arrested to help police catch one of the defendants; and a delivery of the recovered goods, by the person arrested and a police officer, to one of the defendants. It could almost be said that the stolen goods never left the thief's hands until it got to the defendant's hands in *Rojas*.

The factual pattern in *Rojas* is not nearly as compelling as the facts in the case *sub judice*. In this case, the theft occurred in Winston-Salem on 5 December 1980. Stephon Johnson, the thief, was arrested when he tried to sell some of the stolen goods in Greensboro on 6 December 1980. At that time the police recovered the stolen goods. Subsequently, Johnson posted bond. He later tried to borrow money from the defendant in order to get a friend out of jail on bond. On 17 December 1980 Johnson went to court for a preliminary hearing on the theft charge. On 18 December 1980 Johnson went to the Winston-Salem Police Department and agreed with law enforcement officials to go to defendant's place of business to try to sell defendant the sterling silver items that the police had recovered twelve days earlier.

What if Stephon Johnson had not agreed to help the police catch the defendant until the day after Stephon Johnson's trial, some four months later, instead of the day after his preliminary hearing? Would the goods have lost their stolen character by then? Again, at some point, recovered goods must cease being stolen goods. A strained reading of the words "stolen goods" would result otherwise and would lead to unnecessary uncertainty. *United States v. Monasterski*, 567 F. 2d at 681.

I have not turned a deaf ear to the policy arguments advanced by the State and subsumed in the majority opinion. Indeed, because the defense of legal impossibility can create "a fringe benefit for criminals," *United States v. Egger*, 470 F. 2d 1179, 1181 (9th Cir. 1972), *cert. denied* 411 U.S. 954, 36 L.Ed. 2d 416, 93 S.Ct. 1931 (1973), the prosecutor's argument that "there is just as much need to stop, deter, and reform a person who has unsuccessfully attempted or is attempting to commit a crime as who successfully completes a crime" is, as a practical matter, compelling. The defendant herein may have intended to possess goods knowing them to be stolen. We must be guided by the law, however.

> Our law does not punish bad purpose standing alone, however; instead we require that *mens rea* accompany the *actus reus* specifically proscribed by statute. It is one of the most fundamental postulates of our criminal justice system that conviction can result only from a violation of clearly defined standards of conduct. We must apply this principle

evenhandedly and not be swayed by our attitudes about the moral culpability of a particular defendant. It is the function of our legislatures, not courts, to condemn certain conduct. Petitions to punish reprehensible conduct must be addressed to the Congress and not this Court. Being bound by the current statutory language, this case simply does not involve the proscribed criminal act.

*United States v. Monasterski,* 567 F. 2d at 683.

Nothing said herein closes the door to the State's meritorious desire to apprehend "fences." As suggested above the General Assembly can enact a statute to cover the activity involved in this type of case.[1] Second, the State can charge "fences" with conspiracy in cases in which it can show the necessary elements of conspiracy. Third, the State can conduct a surveillance of the stolen goods until they are delivered to the "fence" and then arrest that person.

Believing that our law will not allow a conviction of attempting to receive stolen property, when the underlying offense — receiving stolen property — would not be a crime, I vote to reverse defendant's conviction in 80CRS52198.

---

1. The North Carolina General Assembly in its 1980-81 session had an opportunity to enact as law a bill that would have addressed the issues raised herein. Representatives Helms and Tyson introduced H.80, "Act to Codify the Crime of Attempting to Receive or Possess Stolen Property and to Preclude the Defense of Impossibility so that Fencing Operations May Be Prosecuted More Effectively." The bill was reported unfavorably by the House Judiciary 1 Committee.